# UNITED STATES *v.* RIVERSIDE BAYVIEW HOMES, INC., ET AL.

No. 84–701.   Argued October 16, 1985—Decided December 4, 1985

WHITE, J., delivered the opinion for a unanimous Court.

*Kathryn A. Oberly* argued the cause for the United States. With her on the briefs were former *Solicitor General Lee, Acting Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne,* and *Anne S. Almy.*

*Edgar B. Washburn* argued the cause for respondents. With him on the brief was *Richard K. Gienapp.\**

---

\*Briefs of *amici curiae* urging reversal were filed for the National Wildlife Federation et al. by *Jerry Jackson, Frank J. Kelley,* Attorney General of Michigan, and *Louis Caruso,* Solicitor General; and for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *N. Gregory Taylor* and *Theodora Berger,* Assistant Attorneys General, and *Steven H. Kaufmann* and *David W. Hamilton,* Deputy Attorneys General, *Joseph I. Lieberman,* Attorney General of Connecticut, *Michael A. Lilly,* Attorney General of Hawaii, *Neil F. Hartigan,* Attorney General of Illinois, and *Jill Wine-Banks,* Solicitor General, *William J. Guste, Jr.,* Attorney General of Louisiana, *Stephen H. Sachs,* Attorney General of Maryland, *Hubert H. Humphrey III,* Attorney General of Minnesota, *William L. Webster,* Attorney General of Missouri, *Mike Greely,* Attorney General of Montana, *Robert M. Spire,* Attorney General of Nebraska, *Paul Bardacke,* Attorney General of New Mexico, *Lacy H. Thornburg,* Attorney General of North Carolina, *Arlene Violet,* Attorney General of Rhode Island, *W. J. Michael Cody,* Attorney General of Tennessee, *Jeffrey L. Amestoy,* Attorney General of Vermont, *Charlie Brown,* Attorney General of West Virginia, and *Bronson C. La Follette,* Attorney General of Wisconsin.

JUSTICE WHITE delivered the opinion of the Court.

This case presents the question whether the Clean Water Act (CWA), 33 U. S. C. § 1251 *et seq.*, together with certain regulations promulgated under its authority by the Army Corps of Engineers, authorizes the Corps to require landowners to obtain permits from the Corps before discharging fill material into wetlands adjacent to navigable bodies of water and their tributaries.

I

The relevant provisions of the Clean Water Act originated in the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, and have remained essentially unchanged since that time.   Under §§ 301 and 502 of the Act, 33 U. S. C. §§ 1311 and 1362, any discharge of dredged or fill materials into "navigable waters"—defined as the "waters of the United States"—is forbidden unless authorized by a permit issued by the Corps of Engineers pursuant to § 404, 33 U. S. C. § 1344.[1]   After initially construing the Act to cover only waters navigable in fact, in 1975 the Corps issued interim final regulations redefining "the waters of the United States" to include not only actually navigable waters but also tributaries of such waters, interstate waters and their tributaries, and nonnavigable intrastate waters whose use or misuse could affect interstate commerce.   40 Fed. Reg. 31320

Briefs of *amici curiae* urging affirmance were filed for the American Petroleum Institute by *Stark Ritchie* and *James K. Jackson;* for the Citizens of Chincoteague for a Reasonable Wetlands Policy by *Richard R. Nageotte;* for the Mid-Atlantic Developers Association by *Kenneth D. McPherson;* and for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun* and *Sam Kazman.*

*R. Sarah Compton* and *Robin S. Conrad* filed a brief for the Chamber of Commerce of the United States as *amicus curiae.*

[1] With respect to certain waters, the Corps' authority may be transferred to States that have devised federally approved permit programs. CWA § 404(g), as added, 91 Stat. 1600, 33 U. S. C. § 1344(g).   Absent such an approved program, the Corps retains jurisdiction under § 404 over all "waters of the United States."

(1975). More importantly for present purposes, the Corps construed the Act to cover all "freshwater wetlands" that were adjacent to other covered waters. A "freshwater wetland" was defined as an area that is "periodically inundated" and is "normally characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction." 33 CFR § 209.120(d)(2)*(h)* (1976). In 1977, the Corps refined its definition of wetlands by eliminating the reference to periodic inundation and making other minor changes. The 1977 definition reads as follows:

> "The term 'wetlands' means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." 33 CFR § 323.2(c) (1978).

In 1982, the 1977 regulations were replaced by substantively identical regulations that remain in force today. See 33 CFR § 323.2 (1985).[2]

Respondent Riverside Bayview Homes, Inc. (hereafter respondent), owns 80 acres of low-lying, marshy land near the shores of Lake St. Clair in Macomb County, Michigan. In 1976, respondent began to place fill materials on its property as part of its preparations for construction of a housing development. The Corps of Engineers, believing that the property was an "adjacent wetland" under the 1975 regulation defining "waters of the United States," filed suit in the United States District Court for the Eastern District of Michigan, seeking to enjoin respondent from filling the property without the permission of the Corps.

---

[2] The regulations also cover certain wetlands not necessarily adjacent to other waters. See 33 CFR §§ 323.2(a)(2) and (3) (1985). These provisions are not now before us.

The District Court held that the portion of respondent's property lying below 575.5 feet above sea level was a covered wetland and enjoined respondent from filling it without a permit. Civ. No. 77–70041 (Feb. 24, 1977) (App. to Pet. for Cert. 22a); Civ. No. 77–70041 (June 21, 1979) (App. to Pet. for Cert. 32a). Respondent appealed, and the Court of Appeals remanded for consideration of the effect of the intervening 1977 amendments to the regulation. 615 F. 2d 1363 (1980). On remand, the District Court again held the property to be a wetland subject to the Corps' permit authority. Civ. No. 77–70041 (May 10, 1981) (App. to Pet. for Cert. 42a).

Respondent again appealed, and the Sixth Circuit reversed. 729 F. 2d 391 (1984). The court construed the Corps' regulation to exclude from the category of adjacent wetlands — and hence from that of "waters of the United States"—wetlands that were not subject to flooding by adjacent navigable waters at a frequency sufficient to support the growth of aquatic vegetation. The court adopted this construction of the regulation because, in its view, a broader definition of wetlands might result in the taking of private property without just compensation. The court also expressed its doubt that Congress, in granting the Corps jurisdiction to regulate the filling of "navigable waters," intended to allow regulation of wetlands that were not the result of flooding by navigable waters.[3] Under the court's reading of the regulation, respondent's property was not within the Corps' jurisdiction, because its semiaquatic characteristics were not the result of frequent flooding by the nearby navigable waters. Respondent was therefore free to fill the property without obtaining a permit.

---

[3] In denying the Government's petition for rehearing, the panel reiterated somewhat more strongly its belief that the Corps' construction of its regulation was "overbroad and inconsistent with the language of the Act." 729 F. 2d, at 401.

We granted certiorari to consider the proper interpretation of the Corps' regulation defining "waters of the United States" and the scope of the Corps' jurisdiction under the Clean Water Act, both of which were called into question by the Sixth Circuit's ruling. 469 U. S. 1206 (1985). We now reverse.

## II

The question whether the Corps of Engineers may demand that respondent obtain a permit before placing fill material on its property is primarily one of regulatory and statutory interpretation: we must determine whether respondent's property is an "adjacent wetland" within the meaning of the applicable regulation, and, if so, whether the Corps' jurisdiction over "navigable waters" gives it statutory authority to regulate discharges of fill material into such a wetland. In this connection, we first consider the Court of Appeals' position that the Corps' regulatory authority under the statute and its implementing regulations must be narrowly construed to avoid a taking without just compensation in violation of the Fifth Amendment.

We have frequently suggested that governmental land-use regulation may under extreme circumstances amount to a "taking" of the affected property. See, *e. g.*, *Williamson County Regional Planning Comm'n* v. *Hamilton Bank*, 473 U. S. 172 (1985); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104 (1978). We have never precisely defined those circumstances, see *id.*, at 123–128; but our general approach was summed up in *Agins* v. *Tiburon*, 447 U. S. 255, 260 (1980), where we stated that the application of land-use regulations to a particular piece of property is a taking only "if the ordinance does not substantially advance legitimate state interests . . . or denies an owner economically viable use of his land." Moreover, we have made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn.*, 452

U. S. 264, 293–297 (1981). The reasons are obvious. A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

If neither the imposition of the permit requirement itself nor the denial of a permit necessarily constitutes a taking, it follows that the Court of Appeals erred in concluding that a narrow reading of the Corps' regulatory jurisdiction over wetlands was "necessary" to avoid "a serious taking problem." 729 F. 2d, at 398.[4] We have held that, in general, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law,

---

[4] Even were the Court of Appeals correct in concluding that a narrowing construction of the regulation is necessary to avoid takings of property through the application of the permit requirement, the construction adopted—which requires a showing of frequent flooding before property may be classified as a wetland—is hardly tailored to the supposed difficulty. Whether the denial of a permit would constitute a taking in any given case would depend upon the effect of the denial on the owner's ability to put the property to productive use. Whether the property was frequently flooded would have no particular bearing on this question, for overbroad regulation of even completely submerged property may constitute a taking. See, e. g., Kaiser Aetna v. United States, 444 U. S. 164 (1979). Indeed, it may be more likely that denying a permit to fill frequently flooded property will prevent economically viable use of the property than denying a permit to fill property that is wet but not flooded. Of course, by excluding a large chunk of the Nation's wetlands from the regulatory definition, the Court of Appeals' construction might tend to limit the gross number of takings that the permit program would otherwise entail; but the construction adopted still bears an insufficiently precise relationship with the problem it seeks to avoid.

when a suit for compensation can be brought against the sovereign subsequent to a taking." *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1016 (1984) (footnote omitted). This maxim rests on the principle that so long as compensation is available for those whose property is in fact taken, the governmental action is not unconstitutional. *Williamson County, supra*, at 194–195. For precisely the same reason, the possibility that the application of a regulatory program may in some instances result in the taking of individual pieces of property is no justification for the use of narrowing constructions to curtail the program if compensation will in any event be available in those cases where a taking has occurred. Under such circumstances, adoption of a narrowing construction does not constitute avoidance of a constitutional difficulty, cf. *Ashwander* v. *TVA*, 297 U. S. 288, 341–356 (1936) (Brandeis, J., concurring); it merely frustrates permissible applications of a statute or regulation.[5] Because the Tucker Act, 28 U. S. C. § 1491, which presumptively supplies a means of obtaining compensation for any taking that may occur through the operation of a federal statute, see *Ruckelshaus* v. *Monsanto Co., supra*, at 1017, is available to provide compensation for takings that may result from the Corps' exercise of jurisdiction over wetlands, the Court of Appeals' fears that application of the Corps' permit program might result in a taking did not justify the court in adopting a

[5] *United States* v. *Security Industrial Bank*, 459 U. S. 70 (1982), in which we adopted a narrowing construction of a statute to avoid a taking difficulty, is not to the contrary. In that case, the problem was that there was a substantial argument that retroactive application of a particular provision of the Bankruptcy Code would in every case constitute a taking; the solution was to avoid the difficulty by construing the statute to apply only prospectively. Such an approach is sensible where it appears that there is an identifiable class of cases in which application of a statute will necessarily constitute a taking. As we have observed, this is not such a case: there is no identifiable set of instances in which mere application of the permit requirement will necessarily or even probably constitute a taking. The approach of adopting a limiting construction is thus unwarranted.

more limited view of the Corps' authority than the terms of the relevant regulation might otherwise support.[6]

## III

Purged of its spurious constitutional overtones, the question whether the regulation at issue requires respondent to obtain a permit before filling its property is an easy one. The regulation extends the Corps' authority under § 404 to all wetlands adjacent to navigable or interstate waters and their tributaries. Wetlands, in turn, are defined as lands that are "inundated *or saturated* by surface *or ground water* at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 CFR § 323.2(c) (1985) (emphasis added). The plain language of the regulation refutes the Court of Appeals' conclusion that inundation or "frequent flooding" by the adjacent body of water is a *sine qua non* of a wetland under the regulation. Indeed, the regulation could hardly state more clearly that saturation by either surface or ground water is sufficient to bring an area within the category of wetlands, provided that

[6] Because the Corps has now denied respondent a permit to fill its property, respondent may well have a ripe claim that a taking has occurred. On the record before us, however, we have no basis for evaluating this claim, because no evidence has been introduced that bears on the question of the extent to which denial of a permit to fill this property will prevent economically viable uses of the property or frustrate reasonable investment-backed expectations. In any event, this lawsuit is not the proper forum for resolving such a dispute: if the Corps has indeed effectively taken respondent's property, respondent's proper course is not to resist the Corps' suit for enforcement by denying that the regulation covers the property, but to initiate a suit for compensation in the Claims Court. In so stating, of course, we do not rule that respondent will be entitled to compensation for any temporary denial of use of its property should the Corps ultimately relent and allow it to be filled. We have not yet resolved the question whether compensation is a constitutionally mandated remedy for "temporary regulatory takings," see *Williamson County Planning Comm'n* v. *Hamilton Bank*, 473 U. S. 172 (1985), and this case provides no occasion for deciding the issue.

the saturation is sufficient to and does support wetland vegetation.

The history of the regulation underscores the absence of any requirement of inundation. The interim final regulation that the current regulation replaced explicitly included a requirement of "periodi[c] inundation." 33 CFR § 209.120–(d)(2)*(h)* (1976). In deleting the reference to "periodic inundation" from the regulation as finally promulgated, the Corps explained that it was repudiating the interpretation of that language "as requiring inundation over a record period of years." 42 Fed. Reg. 37128 (1977). In fashioning its own requirement of "frequent flooding" the Court of Appeals improperly reintroduced into the regulation precisely what the Corps had excised.[7]

Without the nonexistent requirement of frequent flooding, the regulatory definition of adjacent wetlands covers the property here. The District Court found that respondent's property was "characterized by the presence of vegetation that requires saturated soil conditions for growth and re-

---

[7] The Court of Appeals seems also to have rested its frequent-flooding requirement on the language in the regulation stating that wetlands encompass those areas that "under normal circumstances do support" aquatic or semiaquatic vegetation. In the preamble to the final regulation, the Corps explained that this language was intended in part to exclude areas characterized by the "abnormal presence of aquatic vegetation in a non-aquatic area." 42 Fed. Reg. 37128 (1977). Apparently, the Court of Appeals concluded that the growth of wetlands vegetation in soils saturated by ground water rather than flooded by waters emanating from an adjacent navigable water or its tributaries was "abnormal" within the meaning of the preamble. This interpretation is untenable in light of the explicit statements in both the regulation and its preamble that areas saturated by ground water can fall within the category of wetlands. It would be nonsensical for the Corps to define wetlands to include such areas and then in the same sentence exclude them on the ground that the presence of wetland vegetation in such areas was abnormal. Evidently, the Corps had something else in mind when it referred to "abnormal" growth of wetlands vegetation—namely, the aberrational presence of such vegetation in dry, upland areas.

production," App. to Pet. for Cert. 24a, and that the source of the saturated soil conditions on the property was ground water. There is no plausible suggestion that these findings are clearly erroneous, and they plainly bring the property within the category of wetlands as defined by the current regulation. In addition, the court found that the wetland located on respondent's property was adjacent to a body of navigable water, since the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent's property to Black Creek, a navigable waterway. Again, the court's finding is not clearly erroneous. Together, these findings establish that respondent's property is a wetland adjacent to a navigable waterway. Hence, it is part of the "waters of the United States" as defined by 33 CFR § 323.2 (1985), and if the regulation itself is valid as a construction of the term "waters of the United States" as used in the Clean Water Act, a question which we now address, the property falls within the scope of the Corps' jurisdiction over "navigable waters" under § 404 of the Act.

## IV

### A

An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress. *Chemical Manufacturers Assn.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 125 (1985); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–845 (1984). Accordingly, our review is limited to the question whether it is reasonable, in light of the language, policies, and legislative history of the Act for the Corps to exercise jurisdiction over wetlands adjacent to but not regularly flooded by rivers, streams, and other hydrographic features more conventionally identifiable as "waters."[8]

---

[8] We are not called upon to address the question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adja-

On a purely linguistic level, it may appear unreasonable to classify "lands," wet or otherwise, as "waters." Such a simplistic response, however, does justice neither to the problem faced by the Corps in defining the scope of its authority under § 404(a) nor to the realities of the problem of water pollution that the Clean Water Act was intended to combat. In determining the limits of its power to regulate discharges under the Act, the Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs—in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land. Where on this continuum to find the limit of "waters" is far from obvious.

Faced with such a problem of defining the bounds of its regulatory authority, an agency may appropriately look to the legislative history and underlying policies of its statutory grants of authority. Neither of these sources provides unambiguous guidance for the Corps in this case, but together they do support the reasonableness of the Corps' approach of defining adjacent wetlands as "waters" within the meaning of § 404(a). Section 404 originated as part of the Federal Water Pollution Control Act Amendments of 1972, which constituted a comprehensive legislative attempt "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101, 33 U. S. C. § 1251. This objective incorporated a broad, systemic view of the goal of maintaining and improving water quality: as the House Report on the legislation put it, "the word 'integrity' . . . refers to a condition in which the natural structure and function of ecosystems [are] maintained." H. R. Rep. No. 92–911, p. 76 (1972). Protection of aquatic ecosystems, Congress recog-

_____

cent to bodies of open water, see 33 CFR §§ 323.2(a)(2) and (3) (1985), and we do not express any opinion on that question.

nized, demanded broad federal authority to control pollution, for "[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source." S. Rep. No. 92–414, p. 77 (1972).

In keeping with these views, Congress chose to define the waters covered by the Act broadly. Although the Act prohibits discharges into "navigable waters," see CWA §§ 301(a), 404(a), 502(12), 33 U. S. C. §§ 1311(a), 1344(a), 1362(12), the Act's definition of "navigable waters" as "the waters of the United States" makes it clear that the term "navigable" as used in the Act is of limited import. In adopting this definition of "navigable waters," Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed "navigable" under the classical understanding of that term. See S. Conf. Rep. No. 92–1236, p. 144 (1972); 118 Cong. Rec. 33756–33757 (1972) (statement of Rep. Dingell).

Of course, it is one thing to recognize that Congress intended to allow regulation of waters that might not satisfy traditional tests of navigability; it is another to assert that Congress intended to abandon traditional notions of "waters" and include in that term "wetlands" as well. Nonetheless, the evident breadth of congressional concern for protection of water quality and aquatic ecosystems suggests that it is reasonable for the Corps to interpret the term "waters" to encompass wetlands adjacent to waters as more conventionally defined. Following the lead of the Environmental Protection Agency, see 38 Fed. Reg. 10834 (1973), the Corps has determined that wetlands adjacent to navigable waters do as a general matter play a key role in protecting and enhancing water quality:

> "The regulation of activities that cause water pollution cannot rely on . . . artificial lines . . . but must focus on all waters that together form the entire aquatic system.

Water moves in hydrologic cycles, and the pollution of this part of the aquatic system, regardless of whether it is above or below an ordinary high water mark, or mean high tide line, will affect the water quality of the other waters within that aquatic system.

"For this reason, the landward limit of Federal jurisdiction under Section 404 must include any adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States, as these wetlands are part of this aquatic system." 42 Fed. Reg. 37128 (1977).

We cannot say that the Corps' conclusion that adjacent wetlands are inseparably bound up with the "waters" of the United States—based as it is on the Corps' and EPA's technical expertise—is unreasonable. In view of the breadth of federal regulatory authority contemplated by the Act itself and the inherent difficulties of defining precise bounds to regulable waters, the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act.

This holds true even for wetlands that are not the result of flooding or permeation by water having its source in adjacent bodies of open water. The Corps has concluded that wetlands may affect the water quality of adjacent lakes, rivers, and streams even when the waters of those bodies do not actually inundate the wetlands. For example, wetlands that are not flooded by adjacent waters may still tend to drain into those waters. In such circumstances, the Corps has concluded that wetlands may serve to filter and purify water draining into adjacent bodies of water, see 33 CFR § 320.4(b)(2)(vii) (1985), and to slow the flow of surface runoff into lakes, rivers, and streams and thus prevent flooding and erosion, see §§ 320.4(b)(2)(iv) and (v). In addition, adjacent wetlands may "serve significant natural biological functions, including food chain production, general habitat, and nesting,

spawning, rearing and resting sites for aquatic . . . species."
§ 320.4(b)(2)(i).   In short, the Corps has concluded that wet-
lands adjacent to lakes, rivers, streams, and other bodies of
water may function as integral parts of the aquatic environ-
ment even when the moisture creating the wetlands does not
find its source in the adjacent bodies of water.   Again, we
cannot say that the Corps' judgment on these matters is un-
reasonable, and we therefore conclude that a definition of
"waters of the United States" encompassing all wetlands ad-
jacent to other bodies of water over which the Corps has ju-
risdiction is a permissible interpretation of the Act.   Because
respondent's property is part of a wetland that actually abuts
on a navigable waterway, respondent was required to have a
permit in this case.[9]

## B

Following promulgation of the Corps' interim final regula-
tions in 1975, the Corps' assertion of authority under § 404
over waters not actually navigable engendered some congres-
sional opposition.   The controversy came to a head during
Congress' consideration of the Clean Water Act of 1977, a
major piece of legislation aimed at achieving "interim im-
provements within the existing framework" of the Clean
Water Act.   H. R. Rep. No. 95–139, pp. 1–2 (1977).   In the

---

[9] Of course, it may well be that not every adjacent wetland is of great
importance to the environment of adjoining bodies of water.   But the ex-
istence of such cases does not seriously undermine the Corps' decision to
define all adjacent wetlands as "waters."   If it is reasonable for the Corps
to conclude that in the majority of cases, adjacent wetlands have significant
effects on water quality and the aquatic ecosystem, its definition can stand.
That the definition may include some wetlands that are not significantly
intertwined with the ecosystem of adjacent waterways is of little moment,
for where it appears that a wetland covered by the Corps' definition is in
fact lacking in importance to the aquatic environment—or where its impor-
tance is outweighed by other values—the Corps may always allow develop-
ment of the wetland for other uses simply by issuing a permit.   See 33
CFR § 320.4(b)(4) (1985).

end, however, as we shall explain, Congress acquiesced in the administrative construction.

Critics of the Corps' permit program attempted to insert limitations on the Corps' § 404 jurisdiction into the 1977 legislation: the House bill as reported out of committee proposed a redefinition of "navigable waters" that would have limited the Corps' authority under § 404 to waters navigable in fact and their adjacent wetlands (defined as wetlands periodically inundated by contiguous navigable waters). H. R. 3199, 95th Cong., 1st Sess., § 16 (1977). The bill reported by the Senate Committee on Environment and Public Works, by contrast, contained no redefinition of the scope of the "navigable waters" covered by § 404, and dealt with the perceived problem of overregulation by the Corps by exempting certain activities (primarily agricultural) from the permit requirement and by providing for assumption of some of the Corps' regulatory duties by federally approved state programs. S. 1952, 95th Cong., 1st Sess., § 49(b) (1977). On the floor of the Senate, however, an amendment was proposed limiting the scope of "navigable waters" along the lines set forth in the House bill. 123 Cong. Rec. 26710–26711 (1977).

In both Chambers, debate on the proposals to narrow the definition of navigable waters centered largely on the issue of wetlands preservation. See *id.*, at 10426–10432 (House debate); *id.*, at 26710–26729 (Senate debate). Proponents of a more limited § 404 jurisdiction contended that the Corps' assertion of jurisdiction over wetlands and other nonnavigable "waters" had far exceeded what Congress had intended in enacting § 404. Opponents of the proposed changes argued that a narrower definition of "navigable waters" for purposes of § 404 would exclude vast stretches of crucial wetlands from the Corps' jurisdiction, with detrimental effects on wetlands ecosystems, water quality, and the aquatic environment generally. The debate, particularly in the Senate, was lengthy. In the House, the debate ended with the adoption of a narrowed definition of "waters"; but in the Senate the limiting

amendment was defeated and the old definition retained. The Conference Committee adopted the Senate's approach: efforts to narrow the definition of "waters" were abandoned; the legislation as ultimately passed, in the words of Senator Baker, "retain[ed] the comprehensive jurisdiction over the Nation's waters exercised in the 1972 Federal Water Pollution Control Act." [10]

The significance of Congress' treatment of the Corps' § 404 jurisdiction in its consideration of the Clean Water Act of 1977 is twofold. First, the scope of the Corps' asserted jurisdiction over wetlands was specifically brought to Congress' attention, and Congress rejected measures designed to curb the Corps' jurisdiction in large part because of its concern that protection of wetlands would be unduly hampered by a narrowed definition of "navigable waters." Although we are chary of attributing significance to Congress' failure to act, a refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction, particularly where the administrative construction has been brought to Congress' attention through legislation specifically designed to supplant it. See *Bob Jones University* v. *United States*, 461 U. S. 574, 599–601 (1983); *United States* v. *Rutherford*, 442 U. S. 544, 554, and n. 10 (1979).

Second, it is notable that even those who would have restricted the reach of the Corps' jurisdiction would have done so not by removing wetlands altogether from the definition of "waters of the United States," but only by restricting the scope of "navigable waters" under § 404 to waters navigable in fact *and their adjacent wetlands*. In amending the definition of "navigable waters" for purposes of § 404 only, the backers of the House bill would have left intact the existing definition of "navigable waters" for purposes of § 301 of the

---

[10] 123 Cong. Rec. 39209 (1977); see also *id.*, at 39210 (statement of Sen. Wallop); *id.*, at 39196 (statement of Sen. Randolph); *id.*, at 38950 (statement of Rep. Murphy); *id.*, at 38994 (statement of Rep. Ambro).

Act, which generally prohibits discharges of pollutants into navigable waters. As the House Report explained: "'Navigable waters' as used in section 301 includes all of the waters of the United States including their adjacent wetlands." H. R. Rep. No. 95–139, p. 24 (1977). Thus, even those who thought that the Corps' existing authority under § 404 was too broad recognized (1) that the definition of "navigable waters" then in force for both § 301 and § 404 was reasonably interpreted to include adjacent wetlands, (2) that the water quality concerns of the Clean Water Act demanded regulation of at least some discharges into wetlands, and (3) that whatever jurisdiction the Corps would retain over discharges of fill material after passage of the 1977 legislation should extend to discharges into wetlands adjacent to any waters over which the Corps retained jurisdiction. These views provide additional support for a conclusion that Congress in 1977 acquiesced in the Corps' definition of waters as including adjacent wetlands.

Two features actually included in the legislation that Congress enacted in 1977 also support the view that the Act authorizes the Corps to regulate discharges into wetlands. First, in amending § 404 to allow federally approved state permit programs to supplant regulation by the Corps of certain discharges of fill material, Congress provided that the States would not be permitted to supersede the Corps' jurisdiction to regulate discharges into actually navigable waters and waters subject to the ebb and flow of the tide, "including wetlands adjacent thereto." CWA § 404(g)(1), 33 U. S. C. § 1344(g)(1). Here, then, Congress expressly stated that the term "waters" included adjacent wetlands.[11] Second, the

---

[11] To be sure, § 404(g)(1) does not conclusively determine the construction to be placed on the use of the term "waters" elsewhere in the Act (particularly in § 502(7), which contains the relevant definition of "navigable waters"); however, in light of the fact that the various provisions of the Act should be read *in pari materia*, it does at least suggest strongly that the term "waters" as used in the Act does not necessarily exclude "wetlands."

1977 Act authorized an appropriation of $6 million for completion by the Department of Interior of a "National Wetlands Inventory" to assist the States "in the development and operation of programs under this Act."   CWA § 208(i)(2), 33 U. S. C. § 1288(i)(2).   The enactment of this provision reflects congressional recognition that wetlands are a concern of the Clean Water Act and supports the conclusion that in defining the waters covered by the Act to include wetlands, the Corps is "implementing congressional policy rather than embarking on a frolic of its own."   *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 375 (1969).

## C

We are thus persuaded that the language, policies, and history of the Clean Water Act compel a finding that the Corps has acted reasonably in interpreting the Act to require permits for the discharge of fill material into wetlands adjacent to the "waters of the United States."   The regulation in which the Corps has embodied this interpretation by its terms includes the wetlands on respondent's property within the class of waters that may not be filled without a permit; and, as we have seen, there is no reason to interpret the regulation more narrowly than its terms would indicate.   Accordingly, the judgment of the Court of Appeals is

*Reversed.*