701 F.Supp. 1075 (1988)
STOECO DEVELOPMENT, LTD., a New Jersey Limited Partnership; Stainton-Burrell Development, Ltd., a New Jersey Limited Partnership; The Shore Memorial Hospital, a Non-Profit Corporation of the State of New Jersey; and The Pennington School, a Non-Profit Corporation of the State of New Jersey, Plaintiffs,
v.
The DEPARTMENT OF THE ARMY CORPS OF ENGINEERS OF the UNITED STATES of America, Defendant.
and
UNITED STATES of America, Plaintiff,
v.
STOECO HOMES, INC.; Stoeco Development, Ltd., a New Jersey Limited Partnership; Stainton-Burrell Development, Ltd., a New Jersey Limited Partnership; The Shore Memorial Hospital, a non-profit Corporation of the State of New Jersey; and The Pennington School, a non-profit Corporation of the State of New Jersey, Defendants.
Civ. A. No. 88-0054.
United States District Court, D. New Jersey.
November 2, 1988.
*1076 Porro and Porro by Alfred A. Porro, Jr., Lyndhurst, N.J. and Ford and Flower, by Arthur T. Ford, III, Ocean City, N.J. for Stoeco Development, Ltd., et al.
Samuel A. Alito, Jr., U.S. Atty., by James C. Woods, Asst. U.S. Atty., Newark, N.J., for the Dept. of the Army Corps of Engineers.

OPINION
COHEN, Senior District Judge:
Presently before us are cross-motions for summary judgment in this consolidated action arising out of the defendant Department of the Army Corps of Engineers' (the "Corps") assertion of jurisdiction over approximately 17 acres of land in Ocean City, New Jersey, which the Government argues contains federally regulated wetlands. Plaintiffs are the owners and developers of the land in question. They move for summary judgment seeking, inter alia, a declaration that the Corps' assertion of jurisdiction is invalid.[1] Defendant's cross-motion seeks a ruling from the Court: a) upholding its assertion of jurisdiction; b) compelling removal of fill materials placed in wetland areas; and, c) imposing substantial monetary penalties for the alleged violations. The parties agree that the deferential "arbitrary and capricious" standard of the Administrative Procedure Act (5 U.S. *1077 C. § 551 et seq.) is applicable in reviewing the Corps' assertion of jurisdiction.
Stoeco initiated this action by filing a complaint on January 5, 1988 seeking injunctive and declaratory relief.[2] On January 7, 1988, the Government filed a separate action against Stoeco for injunctive relief and civil monetary penalties under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. (hereinafter "Clean Water Act" or "CWA").[3] Thereafter, on April 15, 1988, United States Magistrate Joel B. Rosen ordered that the matters be consolidated.
To determine whether or not the agency action was "arbitrary and capricious" it is necessary for this Court to decide: 1) whether the administrative record was complete; and 2) whether that record provided a rational basis upon which to predicate jurisdiction.

I. HISTORY AND DESCRIPTION OF THE LAND
Ocean City is a barrier island separating the Atlantic Ocean from the tidal estuary which lies between it and the mainland of Cape May County. Stoeco Homes, Inc. purchased part of the lands in question from the City of Ocean City at a Public Sale on February 14, 1951.[4] The remainder of the tract over which the Corps now asserts jurisdiction was purchased from the City of Ocean City at a Public Sale on December 15, 1964.[5] Administrative Record at pp. 44, 46 and 63 (hereinafter "AR ____").[6] Generally, both parcels combined are bordered on the east by Haven Avenue, and on the west by Ocean City Municipal Airport. Bay Avenue bisects the parcels on a north-south axis. Ten parallel streets cross east-west through the site, and are enumerated "Twentieth Street" through "Thirty-First Street." See, Defendant's Brief in Opposition, Exhibit A.
Historically, the project site had been primarily salt marsh meadows adjacent to, and with tidal access to Beach Thorofare.[7] Stoeco Homes, Inc. and Stainton-Burrell Development, Ltd. used the land as a dredge material disposal area from approximately *1078 1951 to the summer of 1987. See, AR 44-51. The Government contends that "[a]s a result of the periodic disposal of dredged material on [the] site and the elimination of direct tidal access, the project site has been altered to such an extent that it now displays the characteristics of a brackish freshwater wetland." Defendant's Brief in Opposition, at 9. Stoeco urges, inter alia, that the project site had originally been wetlands but that thirty-seven years of filling in the area altered the lands from salt marsh meadows to dry upland areas; further, that any wetlands that now exist on the site are clearly man-induced, a consequence of the ongoing construction activity and improper grading of the area, and thus, specifically exempt from a wetlands determination under the regulations promulgated under the Clean Water Act.

II. THE CLEAN WATER ACT
Sections 301 and 502 of the Clean Water Act, 33 U.S.C. §§ 1311, 1362, prohibit the discharge of dredged or fill materials into "navigable waters"  defined as "waters of the United States"  unless authorized by a permit issued by the Corps pursuant to § 404, 33 U.S.C. § 1344. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The policies, practices, and procedures to be followed by the Corps in connection with reviewing permits to authorize the discharge of dredged or fill material into "waters of the United States" pursuant to § 404, 33 U.S.C. § 1344 are set forth at 33 C.F.R. § 323 (1987). The term "waters of the United States" and all other terms relating to the geographic scope of jurisdiction are defined at 33 C.F.R. § 328 (1987) as provided for in 33 C.F.R. § 323. Under the implementing regulations, the term "waters of the United States" includes wetlands adjacent to traditional navigable waters and their tributaries. 33 C.F.R. § 328.3(a)(3) (1987). The term "wetlands" means:
those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.
33 C.F.R. § 328.3(b) (1987).
The term "adjacent" means:
bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands."
33 C.F.R. § 328.3(c) (1987).
As then Judge Gerry, now Chief Judge of the United States District Court, District of New Jersey, discussed in United States v. Ciampitti, 583 F.Supp. 483 (D.N.J.1984), the above-cited wetlands regulations were specifically adopted pursuant to court order in National Resources Defense Council v. Callaway, 392 F.Supp. 685 (D.D.C. 1975). In Callaway, the court concluded "that Congress intended the Clean Water Act to assert `federal jurisdiction over the Nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution,' and that the term `navigable waters' was not limited to the traditional tests of navigability." Ciampitti, supra, 583 F.Supp. at 491 (citing Callaway, supra, 392 F.Supp. at 686). Judge *1079 Gerry further noted that courts have continually applied this standard of jurisdiction when reviewing cases involving wetlands determinations. See, id. (citing cases).
The Supreme Court recently upheld the broad regulatory authority of the Corps under the CWA. In Riverside Bayview Homes, supra, the Court concluded that the language, policies, and history of the Clean Water Act compelled a finding that the Corps had acted reasonably in interpreting the Act to require permits for the discharge of fill material into wetlands adjacent to the "waters of the United States." Reversing the Court of Appeals, Justice White speaking for a unanimous Court said:
On a purely linguistic level, it may appear unreasonable to classify "lands," wet or otherwise, as "waters." Such a simplistic response, however, does justice neither to the problem faced by the Corps in defining the scope of its authority under § 404(a) nor to the realities of the problem of water pollution that the Clean Water Act was intended to combat. In determining the limits of its power to regulate discharges under the Act, the Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs  in short, a hugh array of areas that are not wholly aquatic but nevertheless fall far short of being dry land. Where on this continuum to find the limit of "waters" is far from obvious.
Faced with such a problem of defining the bounds of its regulatory authority, an agency may appropriately look to the legislative history and underlying policies of its statutory grants of authority. Neither of these sources provides unambiguous guidance for the Corps in this case, but together they do support the reasonableness of the Corps' approach of defining adjacent wetlands as "waters" within the meaning of § 404(a). Section 404 originated as part of the Federal Water Pollution Control Act Amendments of 1972, which constituted a comprehensive legislative attempt "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101, 33 U.S.C. § 1251. This objective incorporated a broad, systemic view of the goal of maintaining and improving water quality: as the House Report on the legislation put it, "the word `integrity' ... refers to a condition in which the natural structure and function of ecosystems is maintained." H.R.Rep. No. 92-911, p. 76 (1972). Protection of aquatic ecosystems, Congress recognized, demanded broad federal authority to control pollution, for "[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source." S.Rep. No. 92-414, p. 77 (1972).
In keeping with these views, Congress chose to define the waters covered by the Act broadly. Although the Act prohibits discharges into "navigable waters," see CWA §§ 301(a), 404(a), 502(12), 33 U.S.C. §§ 1311(a), 1344(a), 1362(12), the Act's definition of "navigable waters" as "the waters of the United States" makes it clear that the term "navigable" as used in the Act is of limited import. In adopting this definition of "navigable waters," Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed "navigable" under the classical understanding of that term. See S.Conf. Rep. No. 92-1236, p. 144 (1972); 118 Cong.Rec. 33756-33757 (1972) (statement of Rep. Dingell).
Of course, it is one thing to recognize that Congress intended to allow regulation of waters that might not satisfy traditional tests of navigability; it is another to assert that Congress intended to abandon traditional notions of "waters" and include in that term "wetlands" as well. Nonetheless, the evident breadth *1080 of congressional concern for protection of water quality and aquatic ecosystems suggests that it is reasonable for the Corps to interpret the term "waters" to encompass wetlands adjacent to waters as more conventionally defined.
474 U.S. at 132-133, 106 S.Ct. at 462.
The Corps did not immediately assert the full extent of its § 404 authority when the CWA was enacted in 1972. Rather, the Corps phased in the § 404 permit program.[8] In pertinent part, the phased-in schedule provided that after September 1, 1976, permits would be required for any discharge of dredged or fill material into navigable waters of the United States and their primary tributaries, including adjacent wetlands. 42 Fed.Reg. 37145 (1977).
Corps regulations require that a permit be obtained before discharging dredged or fill material into wetlands or other waters subject to CWA jurisdiction. See generally, 33 C.F.R. § 326 (1987). Once the district engineer determines that a violation exists, he should notify the responsible parties. 33 C.F.R. § 326.3(c) (1987). If the violation involves a project that is not complete, a cease and desist order should issue prohibiting any further work pending resolution of the violation. 33 C.F.R. § 326.3(c)(1) (1987). If the project is complete, the district engineer must notify the responsible parties, 33 C.F.R. § 326.3(c)(2) (1987), solicit additional information, if needed, 33 C.F.R. § 326.3(c)(3) (1987), and determine, after consultation with different agencies, including the EPA, whether initial corrective measures must be directed. 33 C.F.R. § 326.3(d) (1987). Finally, upon completion of corrective measures the district engineer must accept an after-the-fact permit application, unless he determines that a permit is inappropriate. 33 C.F.R. § 326.3(e) (1987).

III. STANDARD OF REVIEW
We review the Corps' assertion of jurisdiction under the Administrative Procedure Act. That statute provides in relevant part that a court shall set aside agency findings, conclusions, and actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the Supreme Court made clear that this standard of review is highly deferential and that final agency action is "entitled to a presumption of regularity." The reviewing court must carefully "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 401 U.S. at 416, 91 S.Ct. at 824. However, the "ultimate standard of review is a narrow one" and the reviewing court is not "empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 824. Rather, our duty is to hold the agency to "certain minimal standards of rationality" and restrain from injecting our opinion in place of the agency which, because of its particular expertise, has been entrusted with the decision-making power. Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C.Cir.1976), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); See also, National Wildlife Federation v. Hanson, 623 F.Supp. 1539, 1544 (E.D.N.C.1985). Thus, after scrutinizing the record, "[w]e must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty...." Ethyl Corp. v. EPA, 541 F.2d at 36.
The reviewing court is also limited in scope to the materials considered by the agency at the time it made its decision, and a court must view critically any "`post hoc' rationalizations." Overton Park, 401 U.S. at 419-20, 91 S.Ct. at 825-26. If the agency's decision cannot be sustained on the record, then it must be remanded for further consideration. Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed. 2d 106 (1973).

*1081 IV. ANALYSIS
First, we consider whether the record upon which the Corps based its decision is "complete". Initially, Stoeco urges that the administrative record filed with the Court is "manufactured" and "that only those portions of the alleged [a]dministrative [r]ecord that predate the date of administrative determination, namely June 16, 1987, in fact consists [of] the [real] record." Plaintiffs' Brief in Support of Motion, p. 18. This contention suggests that only six pieces of paper are relevant to our determination of whether the June 16, 1987 administrative decision is "arbitrary and capricious."[9] The thrust of Stoeco's second argument is that the alleged administrative record is replete with glaring omissions, to wit, the absence of: a) the detailed report on the history of the tract prepared by Michael Hyland, Stoeco's engineer; b) the New Jersey Tidelands Base Map; and c) the state wetlands map.
It is necessary to review the chronology of events surrounding the Corps' decision-making process and examine the record itself to determine whether it is, in fact, "not real nor sufficient [but] a sham." See, id.
On April 21, 1987, an Ocean City resident telephoned the Corps and notified it that Stoeco was engaged in filling activities at the project site. AR 4-8. As a result thereof, Corps biologist Robert Pacione inspected the site on May 20, 1987. Corps biologists Michael Claffey and Pacione then studied aerial photography of the site at the New Jersey Department of Environmental Protection ("NJDEP") Office of Environmental Analysis in Trenton, New Jersey. Affidavit of Claffey No. 1, at 4 (hereinafter "Claffey"). The biologists concluded that portions of the project site contained federally regulated wetlands and recommended issuance of a Cease and Desist letter pending a more detailed analysis of the site. Affidavit of Cianfrani at 2 (hereinafter "Cianfrani"); see also, AR 142 (Findings, 5a). On June 12, 1987, Claffey again visited the NJDEP, Office of Environmental Analysis to delineate the extent of federal jurisdiction at the site. Claffey at ¶ 15. The Corps then issued a Cease and Desist Order on June 16, 1987. AR 14-16. This order did not constitute a final jurisdictional determination but rather directed Stoeco to cease and desist from performing work on the project site at least until a meeting could be arranged to delineate the areas subject to federal jurisdiction. AR 14-16.
After issuance of the June 16, 1987 letter, Claffey and Pacione, under the supervision of Dr. Raymond Walker, Chief of the Surveillance and Enforcement Section of the Regulatory Branch of the Corps, performed an in-depth analysis of the site in order to determine the extent of Clean Water Act jurisdiction. Claffey at ¶¶ 6-13; Cianfrani at ¶ 3. Claffey's work culminated in the issuance of a final jurisdictional line determination which was transmitted to Stoeco by letters dated June 30, 1987 and August 31, 1987. See, AR 19-20 and 32-35. The August 31, 1987 letter also advised Stoeco either to remove all unauthorized dredged material within areas of federal jurisdiction or to apply for an after-the-fact permit pursuant to 33 C.F.R. § 326(b)(2) (1987). Subsequent to the Corps' August 31, 1987 jurisdictional determination, Stoeco requested and was provided the opportunity through their legal counsel to submit whatever information they considered relevant in opposition to the Corps' assertion of jurisdiction. In a letter dated September 9, 1987, then counsel for Stoeco notified the Corps that, pursuant *1082 to a previous advisement that the Corps' final jurisdictional determination could be modified if additional information were provided, Stoeco was preparing a comprehensive wetlands investigation on the site including a detailed history of the filling on the site and a scientific report based on hydrological data and information on soils and vegetation. AR 38. By correspondence dated October 8, 1987, Stoeco submitted a detailed report ("Report of the Development of Lands of Stoeco Homes, Inc. and Stainton-Burrell Corporation," and Appendices A & B, otherwise known as the "Hyland Report") concerning the Corps' jurisdictional determination. AR 39-71. This was followed by a meeting at the Corps' Philadelphia District Office on October 13, 1987 wherein Stoeco was given further opportunity to orally explain its position. Claffey and Dr. Walker attended this meeting on behalf of the Corps and also reviewed all of the data and information submitted by Stoeco. Cianfrani at ¶¶ 5-7. Based upon their review of this information, they determined that there was no basis to either revoke or modify the jurisdictional determination. Id.
The Government contends that Stoeco also sought and obtained review of the wetlands delineation at the Corps' Washington, D.C. Office. On November 9, 1987, representatives of Stoeco met with Bernard Goode, Chief of the Regulatory Branch, Office of the Chief of Engineers. At that meeting, Mr. Goode agreed to have his office review the Corps' jurisdictional determination. AR 79. Based upon his office's review, Mr. Goode found no basis to indicate that the Philadelphia District had erred in their determination. This finding was conveyed to counsel for defendants on December 2, 1987. AR 82.
Plaintiffs vigorously contest the government's assertion that any meaningful review of the wetlands determination was obtained at the November, 1987 meeting in Washington, D.C. They argue that this meeting was not a fair hearing because their position was not fully evaluated. They contend the meeting was actually an attempt to have the parties equitably resolve their differences without resort to litigation.
Notwithstanding the parties differences concerning the appropriate characterization of the November 9th meeting, we are unpersuaded by Stoeco's argument that the "alleged" administrative record is "not real nor sufficient [but] a sham." Stoeco's first contention, that only six pieces of paper are relevant to our determination of whether the June 16, 1987 administrative decision is "arbitrary and capricious," is entirely without merit. The Corps, contrary to Stoeco's position, did not make its final jurisdictional determination on June 16, 1987; it merely issued a cease and desist order prohibiting any further work on the site. Such action was consistent with the implementing regulations under the Clean Water Act. See, 33 C.F.R. § 326.3(c)(1) (1987). Although Corps biologists had determined that wetlands existed on the site at the time it sent Stoeco the cease and desist order, the Corps did not make its final jurisdictional line determination until after June 16, 1987. By letters dated June 30, 1987 and August 31, 1987 the Corps communicated its final jurisdictional line to Stoeco. Thus, the "real" administrative record upon which the Corps made its decision would at least contain all field data and correspondence relevant to the tract generated prior to the August 31st date. Accordingly, we reject plaintiffs' assertion that the record should consist of only the six pieces of paper generated prior to June 16, 1987.
Furthermore, with regard to Stoeco's second argument, we find that the record upon which the Corps made its decision was complete at the time of deliberation. The parties do not dispute that on October 8, 1987 then counsel for Stoeco sent the Corps a letter with the Hyland Report attached. Similarly, no dispute exists that a meeting was held on October 13, 1987 at the Corps' Philadelphia Office wherein Stoeco had an opportunity to advance their position as set forth in the Hyland Report. Based upon its review of that supplemental information, the Corps concluded that there was no basis to either revoke or modify its *1083 jurisdictional determination. We cannot conclude, as Stoeco suggests, that the Corps did not review the information provided it prior to the October 13, 1987 hearing. The Hyland Report should have been included in the administrative record and, contrary to Stoeco's argument, was included in the record.
Stoeco also argues that the Corps purposely omitted the New Jersey Tidelands Map and Wetlands Map from the Administrative Record because the State of New Jersey does not regulate the project site under the New Jersey Coastal Wetlands Act of 1970, N.J.S.A. 13:9A-1 et seq. (1988). That Act mandated that the NJDEP make an inventory of "... all tidal wetlands within the State. The boundaries of such wetlands shall generally define the areas that are at or below high water and shall be shown on suitable maps, which may be reproductions or aerial photographs." N.J.S.A. 13:9A-1(b) (1988) (emphasis added). Thus, the NJDEP under the State statute regulates only tidal wetlands. Federal jurisdiction under the CWA, however, extends to all wetlands whether or not they are "at or below high water." See, 33 C.F.R. § 328.3(a)(3), (7) (1987); 33 C.F.R. 328.3(b) (1987).
In the instant matter, the Corps does not take the position that the project site presently functions as a "tidal wetland." Nor as a matter of law is the Corps regulatory authority limited to tidally flowed wetlands. United States v. Tilton, 705 F.2d 429 (11th Cir.1983); Ciampitti, 383 F.Supp. at 494 ("... the existence of an artificial barrier, in this case a railroad embankment, which may prevent tidal flow to a site is not determinative of the limits of Corps' jurisdiction.") Thus, we do not believe omission of the state maps from the administrative record renders the same incomplete.
Finally we address whether the Corps had a rational basis upon which to assert jurisdiction. Stoeco contends that an examination of the history of the tract reveals that the Corps sanctioned the filling activities by issuing maintenance dredging permits for the bay in 1976 and 1979. This argument is unconvincing inasmuch as Condition II(b) of the 1976 permit and Special Condition (h) of the 1979 permit specifically prohibited discharge of fill into wetland areas. AR 343, 352.
According to the definition of 33 C.F.R. 328.3(b) (1987), to be wetlands under Corps regulations an area must be: (1) durationally inundated or saturated; (2) supportive of vegetation dependent on or adapted to saturated soils; and, (3) contain saturated soils. See, definitions cited earlier in this opinion at p. 1078, supra.[10] The administrative record here shows that each of these three parameters have been met. The Corps in this matter conducted soil and photo analysis, collected field data and consulted aerial photographs in reaching its conclusion that the area is wetlands under the implementing regulations.
We cannot substitute our judgment for that of the Corps, which has the technical expertise in this area and has properly reached an administrative determination. Thus, we conclude that the administrative decision made by the Corps was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." Plaintiff's motion to upset that administrative determination shall be denied. Moreover, no interim relief shall be given at this time until an after-the-fact permit has been applied for and a ruling has been made on such by the Corps. The Government's motion is granted to the extent that the Corps' decision is determined to be rational and in accordance with the law. We feel that it is not warranted, however, to assess civil monetary penalties at this time.
An appropriate order shall be entered.

ORDER
This matter having come before the Court on cross-motions for summary judgment to review the Department of the Army Corps of Engineers' decision to assert Federal jurisdiction over certain land owned by plaintiffs under the Federal Water *1084 Pollution Control Act, 33 U.S.C. § 1251 et seq. (1988); and
The Court having reviewed the submissions of the parties and having heard oral argument; and
The Court being satisfied that the Army Corps' decision is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A) (1988); and
For good cause shown;
It is on this 2nd day of November, 1988 ORDERED that the motion of the plaintiffs shall be DENIED in its entirety and the motion of the government shall be granted only insofar as the plaintiffs shall be required to file for an after-the-fact permit under § 404 of the Clean Water Act.
IT IS FURTHER ORDERED that no civil monetary penalties shall be assessed at this time for existing violations under 33 U.S.C. § 1251 et seq. (1988).
NOTES
[1] Plaintiffs also seek, in the alternative, interim relief permitting final construction of the approximately thirteen homes near completion and the others under contract to third persons not parties to this action.
[2] Named as plaintiffs in the January 5, 1988 complaint are: Stoeco Development, Ltd., a New Jersey limited partnership with its principal place of business in Ocean City, New Jersey; Stainton-Burrell Development, Ltd., also a New Jersey limited partnership with its principal place of business in Ocean City, New Jersey; Shore Memorial Hospital, a New Jersey non-profit corporation located in Somers Point, New Jersey; and, the Pennington School located in Pennington, New Jersey. For simplicity sake, plaintiffs are referred to here as Stoeco. The Corps is the only named defendant in the above-mentioned action.
[3] The Government's January 7, 1988 complaint names only Stoeco Homes, Inc., a corporation of the State of New Jersey, as a defendant; however, the Government filed an Amended Complaint on May 6, 1988 naming as defendants, in addition to Stoeco Homes, Inc., all those parties named as plaintiffs in the action filed January 5, 1988. See, supra, note 2. This opinion refers to Stoeco as plaintiffs and the Corps as defendant.
[4] The land purchased in 1951 is generally located between 20th Street and 34th Street and between Bay Avenue and Haven Avenue in Ocean City.
[5] This land includes the tract generally contained by Bay Avenue, Roosevelt Boulevard, and the Ocean City Municipal Airport (now known as "Bay Landings").
[6] On May 13, 1988, the Government submitted to the Court the "alleged" Administrative Record upon which the Corps relied in making its wetlands determination. At this point, the Court refers to the record as the "alleged Administrative Record" because disputes exist as to whether the record submitted by the Government is in fact the "real record" or, rather, a "manufactured" record replete with "`post hoc' rationalizations." See, infra, p. 1080; see also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The "alleged" record consists of four files: File A, Correspondence and Communications; File B, Site Inspections and Reports; File C, 28th Street Stormwater Outfall; and, File D, 1976 and 1979 Maintenance Dredging Permits. Attached to its memorandum in opposition to Stoeco's motion for summary judgment and in support of its cross-motion for summary judgment, the Government filed an appendix which is a paginated version of the "alleged" Administrative Record.
[7] Stoeco does not contest that Beach Thorofare constitutes traditional "navigable waters" nor do they contest the assertion that the project site had formerly been salt marsh meadows; however, plaintiffs do take issue with the Government's assertion that the site had "direct tidal connection with Beach Thorofare." See, Affidavit of Gaylord Inman, at 6-7 (citing, Defendant's Brief in Opposition at p. 9). Mindful that it is our duty to avoid resolving disputed issues of material fact on these cross-motions for summary judgment, we carefully note that we do not believe an actual dispute exists here. Gaylord Inman's affidavit makes reference to the fact that the project site is presently separated from Beach Thorofare by a county road, the municipal airport, other housing developments and a tidal marsh. See, Affidavit of Gaylord Inman at 7. Defendant's brief makes reference to the site in its historical context, i.e., prior to any human development. Thus, we do not think it incorrect to state that the project site historically had been "salt marsh meadows adjacent to, and with tidal access to, Beach Thorofare." Notwithstanding the above, this allegedly inaccurate statement is merely supplied for descriptive background reference and in no way impacts on our decision today and thus, is not a "material fact" for purposes of Fed.R.Civ.P. 56. We are aware, by virtue of the voluminous maps and data submitted, that the site no longer has direct tidal connection with Beach Thorofare as a result of human development.
[8] The phased-in regulations, see, 40 Fed.Reg. 31326, resulted from the Corps' efforts to fully implement the regulatory mandate of the CWA following the decision in Callaway, supra.
[9] Stoeco identifies the six pieces of paper which it argues constitutes the "true" administrative record. They are: 1) an April 21, 1987 record of a telephone call from complainant Leonetti that a "[f]riend who is an environmental planner indicated site is wetlands", AR 4; 2) a May 26, 1987 record of a telephone call to Mary Oehlschlager, a representative of Stoeco Homes, Inc., AR 9; 3) a May 29, 1987 record of a telephone call from plaintiffs' expert, Michael Hyland, advising defendant of history of tract and alleged non-wetland status, AR 10; 4) a June 16, 1987 record of a telephone call to plaintiffs indicating their denial again of wetland status, AR 12; 5) Pacione Site Inspection Report dated June 3, 1987, AR 140-165; and, 6) a record of a telephone call on January 14, 1985 relating to the 28th Street Stormwater Outfall Project, AR 316. See, Plaintiff's brief in support of motion, pp. 13-15.
[10] The interpretive guide for making wetlands determinations which implements this regulation is the "Technical Report Y-87-1 Corps of Engineers Wetlands Delineation Manual" attached as Exhibit C to the Brief for the Government in Opposition to Stoeco's Motion.