**Gary SLAGLE, Plaintiff,**

v.

**The UNITED STATES of America, acting By and Through Col. Roger L. BALDWIN, District Engineer of the United States Army Corps of Engineers, Defendants.**

**No. CV 5–90–170.**

United States District Court,
D. Minnesota,
Fifth Division.

Sept. 23, 1992.

James R. Bresnahan, Cochrane & Bresnahan, St. Paul, MN, for plaintiff.

Robert LeFevre, Environmental Defense Section, U.S. Justice Dept., Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### INTRODUCTION

This matter comes before the Court on defendant/counterclaim plaintiff United States of America's ("United States") motion for partial summary judgment (1) upholding the administrative actions of the United States Army Corps of Engineers ("Corps"); (2) finding plaintiff/counterclaim defendant Gary Slagle ("Slagle") liable on the United States' counterclaim for having unlawfully discharged pollutants into waters of the United States in violation of section 301 of the Clean Water Act ("CWA"), 33 U.S.C. § 1311, without a permit issued by the Corps as required by CWA section 404(a), 33 U.S.C. § 1344(a); (3) enjoining any further unpermitted discharges of pollutants into waters of the United States; and (4) ordering that an evidentiary hearing be held thereafter to determine the appropriate restoration measures to be taken, and the appropriate civil penalties to be imposed. Slagle opposes each aspect of the summary judgment motion, claiming that the Corps does not have jurisdiction over his property, that the Corps' regulatory action constitute a taking without just compensation under the Fifth Amendment of the United States Constitution, and that the Corps' administrative decision in denying Slagle's permit application and mitigation proposal was arbitrary, capricious and otherwise in violation of the Administrative Procedure Act, 5 U.S.C. § 702.

### BACKGROUND

Gary Slagle is the owner of 16 parcels of real property, located on the east shore of Inguadona Lake, Cass County, Minnesota. The lots had been platted as "Cedar Shadows" development by Cass County in 1972, and Slagle purchased the lots in 1981 with

the intent of developing them as residential property.

In April, 1985, and March, 1987, the Cass County Zoning Board of Adjustment approved "fill applications" for staggered lots in Slagle's development. These applications were unanimously approved after public meetings in which the adjoining property owners stated that they were not opposed to Slagle's fill variance application. Cass County did not advise Slagle that any additional permits from the Minnesota Department of Natural Resources or the United States would be necessary to fully authorize the discharge of fill on his development property.

From 1984 to May, 1988, Slagle has discharged approximately 18,500 cubic yards of dredged or fill material consisting of soil, rock, or organic matter. Approximately 886 feet of roadway and 2,340 feet of drainage ditched alongside the roadway were also constructed.

The Corps first learned of this development activity on Slagle's property when Corps investigator Jeffrey Koschak conducted a site inspection on or about May 2, 1988. This activity appeared to violate CWA regulations in that fill had been discharged on approximately 5.33 acres of wetland within a cedar swamp. Koschak ordered Slagle to stop performing any work on the site until Slagle applied for an after-the-fact ("ATF") permit and the application had been processed.

Slagle filed an application for an ATF permit on May 6, 1988, seeking permission to retain the filling work already completed. In addition, he sought permission to (1) fill an additional half-acre of wetland; (2) dredge a new ditch approximately 350 feet long and 2–3 feet wide, for the purpose of draining the site at a faster rate than the existing ditch could accomplish; and (3) place the material dredged from the ditch on top of the existing fill. By way of proposed mitigation, Slagle also proposed to excavate two wildlife ponds in wetland areas in the vicinity of the site.

The Corps issued public notice on July 27, 1988, reviewed and responded to letters from concerned persons, organizations, and government agencies. The review period was shortened from 30 days to 20 days at the request of Congressman James Oberstar on behalf of Slagle. The Corps did not specifically request comments from the Cass County Board of Adjustment, although it received a copy of the public notice, as did other interested persons and organizations. A majority of those responding to the public notice expressed disfavor or doubt about Slagle's project, although there were some respondents who felt that Slagle's development was very attractive, from both an aesthetic and environmental point of view.

The Corps denied Slagle's application for the reasons stated in the Permit Evaluation and Decision Document, addressing the various elements set forth in the CWA regulations and concluding that issuance of a fill permit "would be contrary to the public interest, and that restoration is necessary to restore those values and functions that have been adversely impacted through the unauthorized placement of dredged and/or fill material." The Corps ordered Slagle to restore the wetlands to their pre-violation condition by August 31, 1989.

At Slagle's request, the Corps extended the restoration date to June 30, 1990, while Slagle submitted a second, more extensive mitigation proposal as part of his ATF application. The Corps denied this second proposal on April 19, 1990, again finding it contrary to the public interest.

On August 13, 1990, Slagle brought this action against the United States and Cass County[1], claiming that the Corps was without jurisdiction to regulate his property, the Corps unlawfully withheld an applicable nationwide permit from Slagle[2], the

---

1. Defendant Cass County was dismissed by Order of Judge Robert G. Renner, dated May 31, 1991 (Docket No. 24).

2. Although Slagle raised the issue of unlawful denial of a nationwide permit in his Complaint (¶ 24) and the United States addressed the claim in its Motion for Partial Summary Judgment, Slagle did not discuss, or present any facts rele-

Corps' denial of his permit applications was arbitrary and capricious, and that because the Corps failed to respond to public notices issued in conjunction with his Cass County permit applications, the Corps should be estopped from claiming jurisdiction or enforcing its restoration order. Slagle seeks injunctive relief, enjoining the Corps from enforcing its restoration order and ordering the Corps to withdraw this order, and a finding that the Corps' decision with regard to his permit and mitigation plans was arbitrary and capricious.

## DISCUSSION

## I. VIOLATION OF CWA §§ 301(a) AND 404

### A. *Jurisdiction*

The elements of a violation of sections 301(a) and 404 of the CWA, 33 U.S.C. §§ 1311(a) and 1344(a)[3] are (1) the discharge of pollutants (2) from point sources (3) into waters of the United States. The only element which Slagle disputes is the characterization of his wetland property as "waters of the United States" within the meaning of the CWA. Slagle asserts that his property is not part of the "waters of the United States", thus depriving the Corps of regulatory jurisdiction.

The Supreme Court has recognized Congress' intent to give "waters of the United States" the broadest possible meaning under the Commerce Clause and not to restrict CWA jurisdiction to traditional tests

of navigability. *United States v. Riverside Bayview Homes*, 474 U.S. 121, 133, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985). Furthermore, the Court found that

the evident breadth of congressional concern for protection of water quality and aquatic ecosystems suggests that it is reasonable for the Corps to interpret the term "waters" to encompass wetlands adjacent to waters as more conventionally defined. Following the lead of the Environmental Protection Agency (citation omitted), the Corps has determined that wetlands adjacent to navigable waters do as a general matter play a key role in protecting and enhancing water quality. . . .

We cannot say that the Corps' conclusion that adjacent wetlands are inseparably bound up with the "waters" of the United States—based as it is on the Corps' and EPA's technical expertise—is unreasonable. In view of the breadth of federal regulatory authority contemplated by the Act itself and the inherent difficulties of defining precise bounds to regulable water, the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act.

*Id.* at, 133–34, 106 S.Ct. at 462–63.[4]

Thus, there can be no question that wetlands adjacent to waters of the United

---

vant to, this issue in his responsive papers. Based on the record submitted and the relevant regulations (33 C.F.R. § 330.5), the Court finds that Slagle has failed to carry his burden in overcoming a motion for summary judgment, and the United States is entitled to judgment as a matter of law on this issue raised in Paragraph 34 of Slagle's Complaint.

**3.** The provisions provide:

Except as in compliance with this section and sections ... and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.
33 U.S.C. § 1311(a).
The Secretary may issue permits, after notice and an opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.
33 U.S.C. § 1344(a).

**4.** Slagle cites 33 C.F.R. § 329.3 for the proposition that the ultimate definition of "navigable waters" rests with the courts. This section provides:

Precise definition of "navigable waters of the United States" or "navigability" are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies. However, the policies and criteria contained in this regulation are in close conformance with the tests used by Federal courts and determinations made under this regulation are considered binding in regard to the activities of the Corps of Engineers.

However, in § 329.1 of the same Part, the regulation specifically states that the definition of "navigable waters" does *not* apply to authorities under the CWA which are described under 33 C.F.R. §§ 323 and 328. In this case, the

States fall within the meaning of "waters of the United States" under the CWA. The correctness of this interpretation has been confirmed by the adoption of regulations in 1986, specifically defining the term "waters of the United States" as it applies to the jurisdictional limits of the Corps' authority under the CWA. *See* 33 C.F.R. § 328.3(a) (1991).[5]

In this case, Slagle has not challenged the identification of his property as "wetlands" within the meaning of the statute and regulations[6], but rather disputes their location as adjacent to *waters of the United States*. That is, he asserts that Inguadona Lake is *not* part of the "waters of the United States" because it is not "currently used, or [was] used in the past, or may be susceptible to use in interstate or foreign commerce", and therefore his wetland property cannot be considered a wetland adjacent to "waters of the United States." Slagle insists that a body of water must be navigable in order to be part of the "waters of the United States", and that one of the Corps' own maps does not identify Inguadona Lake as navigable.[7]

■ This narrow reading of the meaning of "waters of the United States" ignores established caselaw with respect to the criterion of navigability in relation to "waters of the United States." *See Riverside Bayview Homes*, 474 U.S. at 133–34, 106 S.Ct. at 462–63. In addition, it ignores the fact that the definition expressly includes tributaries of such waters. 33 C.F.R. § 328.3(5). Slagle does not dispute that Inguadona Lake is hydrologically connected to the Boy River which feeds into Leech Lake, from which the Leech Lake River empties into the Mississippi River. In this sense, Inguadona is a tributary of waters used in interstate commerce—the Mississippi River—and is considered a "water of the United States" in its own right. Thus, Slagle's property is a wetland adjacent to "waters of the United States" within the meaning of the CWA, and the Corps has properly asserted jurisdiction over this wetland.

■ As Slagle does not dispute that he discharged pollutants from a point source, and this was done into a wetland adjacent to the waters of the United States, the United States is entitled to judgment as a matter of law on its counterclaim that Slagle violated sections 311(a) and 404(a) of the CWA. Slagle has not presented any specific facts which establish a genuine issue of material fact which would preclude summary judgment for the United States on this issue.[8]

---

Corps' jurisdictional authority is defined in 33 C.F.R. § 328, thus rendering Part 329 inapplicable.

5. The definition reads in relevant part:
   (a) The term "waters of the United States" means
   (1) All waters which are currently use, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; . . .
   (5) Tributaries of waters identified in paragraphs (a)(1) through (4) of this section; . . .
   (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section.
   33 C.F.R. § 328.3(a).

6. The definition of "wetlands" is found in 33 C.F.R. § 328(b) and reads:
   The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturat-

ed soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.
   Slagle's own expert does not disagree with the Corps' determination that Slagle's property meets the three determinative criteria in identifying a wetland—the prevalence of wetland vegetation; a hydric soil condition; and wetland hydrology.

7. This claim forms the basis for Slagle's estoppel claim, discussed *infra*.

8. Slagle has also argued that the Corps' jurisdiction was not effective until *after* he discharged the fill material on his wetland property. The regulations which clarify the Corps' responsibilities under the CWA did not go into effect until November 13, 1986. It is clear, however, that the Corps was given authority over wetlands pursuant to the CWA as early as July 25, 1975, when CWA regulations were published stating that the "waters of the United States" included "freshwater wetlands, including marshes, shallows, swamps and similar areas that are contiguous or adjacent to other navigable waters and that support freshwater vegetation . . . ." 33

B. *Alleged Defenses*

In addition to arguing that the Corps does not have jurisdiction, Slagle asserts two alternative defenses in the event the Court determines that the Corps does have jurisdiction over his property.

1. Estoppel: First, Slagle maintains that the United States is estopped from asserting jurisdiction over his development because the "Corps has committed affirmative misconduct by publishing maps of navigable waters of the United States intending that the public will rely on these maps...." (Slagle's Memorandum in Opposition to Motion for Summary Judgment, p. 10). These maps bore the heading "Waters Covered by Section 10 of the 1899 Rivers and Harbors Act under the Jurisdiction of the St. Paul District, Corps of Engineers." Underneath the heading was the notice "All Other Waters and Wetlands Not Shown on this Map Should be Considered to Be Covered by Section 404 of the 1972 Act." Slagle also contends that the Corps should be estopped because the Corps did not respond to the public notices published in conjunction with his Cass County permit applications. (Complaint, ¶ 26).

■ Both these claims of estoppel fail for the reason that the actions or inactions do not rise to the level of "affirmative misconduct" required to maintain an estoppel claim against the United States, and Slagle cannot demonstrate reasonable reliance. To prevail on an estoppel claim against the government, Slagle must prove that (1) there was affirmative misconduct by an agent of the United States (2) upon which he reasonably relied and (2) to his detriment. *Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 59–60, 104 S.Ct. 2218, 2223–24, 81 L.Ed.2d 42 (1984). As a matter of law, this Court finds that no action or inaction in which the Corps engaged with respect to failing to respond to the Cass County public notices constituted "affirmative misconduct." *See United States v. Weiss,* 642 F.2d 296, 299

C.F.R. § 209.120(d)(2)(h) (1976). *See also United States v. Southern Inv. Co.,* 876 F.2d 606, 611

(9th Cir.1981) ("The failure of an executive agency to act does not forfeit or surrender governmental property rights."); *Green v. United States Department of Labor,* 775 F.2d 964, 970 (8th Cir.1985) ("Although this delay [in providing plaintiff's FECA benefits under 5 U.S.C. § 8101 et seq.] may constitute negligence by the government, it does not rise to the level of "affirmative misconduct" required before this court will consider whether an estoppel defense may be asserted against the United States."); *Chien–Shih Wang v. Attorney General of the United States,* 823 F.2d 1273, 1275–76 (8th Cir.1987) (the fact that the INS gave erroneous advice did not constitute affirmative misconduct even though the plaintiff suffered hardship). Moreover, as enforcement of the CWA is discretionary (*Dubois v. Thomas,* 820 F.2d 943, 946–47 (8th Cir. 1987)), the Corps is not under any legal duty to attend every public hearing, or respond to every public notice concerning matters within its jurisdiction.

■ The Court also finds that Slagle has not, and cannot, establish reasonable reliance on the maps published by the Corps, given the obvious heading and notice contained therein. In addition, publication of such maps does not constitute affirmative misconduct.

■ 2. Fifth Amendment Taking: Second, Slagle claims that he has suffered a taking pursuant to the Fifth Amendment of the United States Constitution (and Article I, Section 13 of the Minnesota Constitution) insofar as the Corps seeks to deprive him of all economically beneficial uses of the property in the name of the common good. *See Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992). Slagle does not argue that the mere regulation of his property constitutes an invalid "regulatory taking" per se as established precedent does not support such a claim. *See Riverside Bayview Homes,* 474 U.S. at 127, 106 S.Ct. at 459 ("application of land-use regulations to a particular piece of

(8th Cir.1989).

property is a taking only 'if the ordinance does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land.' Moreover, ... it [is] quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." (citations omitted)).

However, Slagle does argue that because the United States has not regulated the adjacent landowners in the same way as it attempts to do here and because neither Slagle nor Cass County was aware of the Corps' assertion of jurisdiction over the wetlands until well after Slagle began developing the property, the Corps' assertion of jurisdiction and subsequent regulation constitutes a taking. Not only does Slagle offer no legal support for this theory [9], but this lawsuit is not the proper forum for resolving the issues of taking and just compensation. The Eighth Circuit has stated that in a suit challenging the Corps' enforcement powers, the taking defense is inappropriate. *U.S. v. Southern Inv. Co.*, 876 F.2d 606, 614 (8th Cir.1989) ("if the Corps has indeed effectively taken respondent's property, respondent's proper course is not to resist the Corps' suit for enforcement by denying that the regulation covers the property, but to initiate a suit for compensation in the Claims Court", quoting *Riverside Bayview*, 474 U.S. at 129 n. 6, 106 S.Ct. at 460 n. 6.). The Court rejects Slagle's taking defense.

## II. ALLEGED VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT

As the CWA does not provide for judicial review of agency action under section 404, the Corps' action is reviewable only under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. The APA allows courts to set aside agency actions, findings, and conclusions found to be "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A).

■ Judicial review under the APA is deferential to the agency's determination. *Lile v. University of Iowa Hospitals & Clinics*, 886 F.2d 157, 160 (8th Cir.1989); *see also Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The court may not substitute its judgment for that of the agency, but must look only to whether the agency has considered "the relevant factors" or made "a clear error of judgment." *Bowman Transp. Inc. v. Arkansas–Best Freight Sys. Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Missouri Coalition for the Environment v. Corps of Engineers*, 866 F.2d 1025, 1033 (8th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 42 (1989) ("the question [on judicial review of agency action] is whether an agency 'considered' environmental effects, not the correctness of the decision."). While the court may not supply a basis for the agency decision, a decision "of less than ideal clarity" will be upheld "if the agency's path may reasonably be discerned." *Id.* 419 U.S. at 285–86, 95 S.Ct. at 442.

In making a determination regarding the approval of a permit or mitigation application, the Corps must address *all* the relevant factors listed in the regulations, set forth at 33 C.F.R. § 320.4. There are three general criteria for the Corps' consideration in every permit application: the relative extent of the public and private need for the proposed work; whether there are reasonable alternative locations and methods to accomplish the objective of the proposed work, and the extent and permanence of the beneficial and/or detrimental effects which the work is likely to have on the public and private uses to which the area is suited. 33 C.F.R. § 320.4(a)(2). "The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." *Id.* at § 320.4(a)(1). The regulations describe specific factors which

---

9. To the extent this theory is based on the doctrine of estoppel, the Court has addressed its

merits above.

**712**

the Corps should consider in its evaluation of the permit application.[10]

In this case, Slagle has only taken issue with two factors in the Corps' evaluation of his permit application and mitigation proposal. First, Slagle contends that the Corps failed to consult with Cass County officials regarding the local agency's interest in, and zoning decisions regarding, Slagle's development. Slagle claims that such consultation is mandated by the following regulation concerning the interaction among federal, state, and local authorities:

(1) ... Even if official certification and/or authorization is not required by state or federal law, but a state, regional, or local agency having jurisdiction or interest over the particular activity, due consideration shall be given to those official views as a reflection of local factors of the public interest.

(2) The primary responsibility for determining zoning and land use matters rests with state, local and tribal governments. The district engineer [Corps representative] will normally accept decisions by such governments on those matters unless there are significant issues of overriding national importance. Such issues would include but are not necessarily limited to national security, navigation, national economic development, water quality, preservation of special aquatic areas, *including wetlands*, with significant interstate importance, and na-

tional energy needs. Whether a factor has overriding importance will depend on the degree of impact in an individual case.

(4) In the absence of overriding national factors of the public interest that may be revealed during the evaluation of the permit application, a permit will generally be issued following receipt of a favorable state determination provided the concerns, policies, goals, and requirements as expressed in 33 CFR Parts 320–324, and the applicable statutes have been considered and followed....

33 C.F.R. § 320.4(j)(1), (2), and (4) (emphasis added).

■ While it is clear that the Corps must take into account any local regulatory agency's opinions and decisions, there is no requirement that the Corps affirmatively seek out comments from any particular local agency. The regulations merely provide that "public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest." 33 C.F.R. § 325.3(a). Interested Cass County officials had as much opportunity to comment on Slagle's permit application as any other person.[11]

■ Even if the Cass County Zoning Board of Adjustment did not submit com-

---

**10.** These specific factors, including their cumulative effects include: conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

For activities involving discharge regulated by section 404 of the CWA, a permit will be approved only if the proposal meets the guidelines and criteria set out in 40 C.F.R. § 230. These 404(b)(1) guidelines require consideration of the proposed activities's potential impact on: the physical, chemical and biological characteristics of the aquatic ecosystem; impact on wetlands, *as a special type of aquatic ecosystem;* the human use characteristics, including use as a recreational fishery. 40 C.F.R. § 230.

**11.** The regulations provide that

[p]ublic notices will be distributed for posting in post offices or other appropriate public places in the vicinity of the site of the proposed work and will be sent to the applicant, to *appropriate city and county officials,* to adjoining property owners, to appropriate state agencies, ... and to any other interested party.

33 C.F.R. § 325.3(d)(1).

The list of mailing labels attached to Slagle's permit application indicates that the postmaster, Cass Lake mayor, and Carol Millard of Cass County Zoning in Walker, Minnesota, as well as adjoining property owners and others, received a copy of the public notice. (Defendant's Exhibit A, Vol. I, Item 1). Under the regulation, a "lack of response will be interpreted as meaning that there is no objection to the proposed project." 33 C.F.R. § 325.3(d)(3).

ments to the Corps regarding Slagle's permit application, it is clear that the Corps considered factors relevant to the local interest and need for the proposed work. The Corps' Permit Evaluation and Decision Document included findings with respect to the following general public interest factors: noise levels, aesthetic values, recreation, transportation, public health, safety, community growth, business/home relocation, existing/potential land use, property values, public facilities and services, employment, business activity, farmland/food supply, flooding, energy, mineral needs, air quality, terrestrial habitat, aquatic habitat, habitat diversity and interspersion, water quality, water supply, groundwater, soils, shoreline processes, wetlands, and secondary and cumulative effects.

Although the Corps concluded that the proposed work would "not cause significant adverse effects on recreational, aesthetic or economic values" (Defendant's Exhibit A, Vol. I, Item 46, p. 11), the evaluation process demands a *balancing* of factors. The Corps made the determination that there were significant adverse effects on the aquatic environment which could be eliminated or alleviated by the use of an alternative project plan (*id.*), thereby tipping the balance in favor of denying Slagle's permit application.

Second, Slagle claims that the Corps reached an incorrect conclusion in finding that there were alternative properties available for development. The existence of a "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences" is one factor the Corps must consider when evaluating the proposed discharge of dredged or fill material. 40 C.F.R. § 230.-10(a).

■ An alternative is not deemed impracticable simply because the applicant does not own an alternative area for the project, if such an alternative area can reasonably be obtained by the applicant. *Id.* at § 230.10(a)(2). Furthermore, when the proposed project is not "water dependent"

(i.e., it does not require access or proximity to a special aquatic site (such as a wetland) to fulfill its basic purpose), "practicable alternatives ... are presumed to be available, unless clearly demonstrated otherwise." *Id.* at § 230.10(a)(3).

■ As Slagle's residential development was not strictly "water dependent", practicable alternatives may be assumed to exist in the absence of any evidence otherwise. Slagle has not come forward with any specific facts establishing a genuine issue of material fact as to the availability of alternative sites, and has failed his burden under the statute and under summary judgment.

The Corps undertook a similarly comprehensive review of Slagle's second mitigation proposal, and again reached the conclusion that it was not in the public interest. The Corps found that "the proposed off-site creation of an emergent wetland and a sedimentation basin would not replace the current water quality functions and wildlife habitat values that are served by the existing cedar swamp." (Defendant's Exhibit A, Vol. II, Item 14). Slagle can point to no aspect of the Corps' evaluation process which is arbitrary and capricious or in clear error of judgment—in fact, his own expert engineering witness admits that it is possible that there could be differences of opinion as to the reasonableness of a mitigation proposal and that he could detect no incompetence or lack of expertise on the part of the Corps regarding their application of scientific knowledge and methods and of the regulations. (Defendant's Exhibit F, Duncan Deposition, pp. 70–73).

This Court cannot conclude, as a matter of law, that the Corps' decisions to deny Slagle's permit application or his second mitigation plan were "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). Slagle has not come forward with any specific facts which establish a genuine issue of material fact as to the arbitrary or capricious nature of the Corps' determination, and the United States is entitled to summary judgment.

## ORDER

Based upon the file, records, briefs and arguments of counsel, IT IS HEREBY ORDERED that

1. Defendant/counterclaim plaintiff United States' Motion for Partial Summary Judgment is GRANTED;

2. Plaintiff Slagle is enjoined from any further unpermitted discharges of pollutants into the waters of the United States; and

3. An evidentiary hearing be held to determine the appropriate restoration measures to be taken, and the appropriate civil penalties to be imposed.