DECISION
Woodland Manor III Associates Limited Partnership (Woodland or plaintiff), amended its initial complaint in this matter to include a constitutional takings claim. Now before this Court, pursuant to R.C.P. 56, is the Rhode Island Department of Environmental Management's (DEM or defendant) motion for summary judgment.
Facts and Travel[1]
This case is rooted in actions initiated by the parties over twenty years ago. In the early 1970's, Mapleroot Development Company (MDC or Mapleroot) purchased a large tract of land (approximately 89 acres) in Coventry, Rhode Island for development purposes. The envisioned project was a "Planned Unit Development" and was to include different types of buildings to be combined as an integrated, cohesive whole. Although ultimately designed to work together as a "unit," the buildings were to be constructed in phases. The proposed development called for construction of an apartment complex (Woodland Manor I), an elderly housing facility (Woodland Manor II), a nursing home (Coventry Health Center), and a condominium complex (Woodland Manor III). Over the years, all but the 20 acres dedicated to Woodland Manor III were developed. For financial purposes, different business entities were used to implement the various phases of the project. However, these various entities were managed by the same people and operated as a coadunate component of the larger business enterprise. The plaintiff in this matter, Woodland Manor III Associates, is the last in this series of interrelated entities.
This case stems from a letter issued to MDC on June 17, 1974. In this letter, the Department of Natural Resources (DNR, predecessor to the DEM) responded to Mapleroot's application for wetlands determination by stating that the Freshwater Wetlands Act did not apply to any proposal for development of Woodland Manor[2] above the 247.5[3] foot topographical elevation contour line.[4] Based upon the terms of this letter and the grant implicit therein, development of Woodland Manor commenced. Construction began in 1978 and continued unimpeded by the DEM, for a number of years. The final phase of the development had yet to be completed when the DEM changed its position on Woodland Manor.
On August 28, 1986, in response to an inquiry by the developers, DEM informed Mapleroot that construction of Woodland Manor III represented a significant alteration of wetlands. As a result, a formal wetlands alteration permit application would be required. Instead of filing an application with the DEM, Mapleroot filed a complaint with the Superior Court seeking equitable relief. On February 10, 1994, a decision was issued which equitably estopped the DEM from requiring the formal wetlands permit. Woodland Manor Associates was ordered to resubmit the final drainage and grading plans for Woodland Manor III. Finally, DEM was deemed to be bound by the terms of the 1974 DNR letter and the 274.5 foot elevation restriction imposed thereby and ordered to review the final grading and drainage calculation for Woodland Manor III expeditiously.
Subsequent to this, Woodland Manor Associates determined that continued development of Woodland Manor III was unfeasible and informed the Court that there would be no further plans submitted to the DEM for review, as was otherwise mandated by the February 10, 1994 decision. Thereafter, the complaint in the instant matter was amended to include a temporary constitutional takings claim. The plaintiff alleges that the defendant's actions during the period from 1986, when the initial application for approval of Woodland Manor III was submitted and denied, to 1994, when the Court entered its decision against the DEM, amounted to an unreasonable and unjustifiable temporary inverse condemnation of plaintiff's property. With respect to this temporary takings claim, the defendant has made the within motion for summary judgment.
Standard Of Review
Summary Judgment is a drastic remedy that should be cautiously applied. McPhillips v. Zayre Corp., 582 A.2d 747, 749 (R.I. 1990); Rustigian v. Celona, 478 A.2d 187, 189 (R.I. 1984). Summary Judgment should be issued when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Alfano v. Landers, 585 A.2d 651, 652 (R.I. 1991).
In passing on a motion for summary judgment, the trial justice must review the pleadings and affidavits in a light most favorable to the party opposing the motion. McPhillips, 582 A.2d at 749; O'Hara v. John Hancock Mutual Life Insurance Co.,574 A.2d 135, 136 (R.I. 1990). Nevertheless, the party opposing summary judgment may not rest upon mere allegation or denials in its pleadings and has an affirmative duty to set forth specific facts showing a genuine issue of fact to be resolved at trial.Ouimette v. Moran, 541 A.2d 855, 856 (R.I. 1988). Failure to set forth such facts will result in entry of summary judgment against the party opposing the motion. Ardente v. Horan, 117 R.I. 254, 257-258, 366 A.2d 162, 164 (1976).
Temporary Unconstitutional Regulatory Taking
The well established doctrine of takings jurisprudence has for years rested upon the proposition that "while property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking." Lucas v. South Carolina CoastalCouncil, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 812 (1992) (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922)). In any takings analysis, the ultimate issue hinges upon a determination of when and under what circumstances the regulation can be said to have gone "too far." The well settled law in this field eschews any type of set formula in favor of a more ad hoc factual inquiry. Lucas, 505 U.S. at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812 (quoting Penn Central Transportation Co. v. New York City,438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978)). Therefore, this Court undertakes its review of the present motion, cognizant of the fact that the factually intensive nature of a constitutional takings claim argues against a precipitous grant of summary judgment. Yuba Goldfields. Inc. v.United States, 723 F.2d 884, 887 (Fed. Cir. 1983).
An examination of the various factors deemed relevant to a takings analysis[5] is premature. Before reaching the substance of the takings claim itself, this Court addresses the defendant's preliminary contention that summary judgment is warranted because the initial permit requirements at issue herein were nothing more than a mere assertion of jurisdiction and, as such, are insufficient as a matter of law to constitute a taking.
DEM argues that prior efforts to extend the takings doctrine to actions which impose permit application requirements on property owners have failed. The United States Supreme Court has ". . . made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." United States v. Riverside Bayview Homes,Inc., 474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419, 426 (1985). Additionally, the Court has stated that
 [a] requirement that a person obtain a permit before engaging in a certain use of his or her property does not in and of itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.
Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 801 (Fed Cir. 1993) (quoting Riverside, 474 U.S. at 126-127, 106 S.Ct. at 458-459, 88 L.Ed.2d at 426).
The initial assertion of regulatory jurisdiction over the wetlands at Woodland Manor amounted to nothing more than an exercise of authority by the DEM of the type referred to above. In its 1986 letter to Mapleroot, the DEM merely sought to bring the developers within the ambit of its wetlands permitting process. However, at issue herein is whether the peculiarities of this particular case and, specifically, this Court's 1994 decision, transformed this initial assertion of jurisdiction into a compensable unconstitutional taking. Woodland claims that this Court's opinion establishes the action as more than a mere jurisdictional exercise. DEM contests this characterization and the consequences that necessarily follow therefrom.
This Court finds that under the applicable precedent set down by the U.S. Supreme Court in Riverside and its progeny, the actions at issue herein are insufficient as a matter of law to constitute a taking. Moreover, the procedural intricacies of this case and this Court's 1994 estoppel decision fail to transform DEM's actions into an extra jurisdictional exercise.
In crafting its decision, this Court draws heavily upon the persuasive authority of Tabb Lakes, Ltd. v. United States,10 F.3d 796 (Fed. Cir. 1993). In Tabb Lakes, a property owner sued the United States, seeking compensation for a temporary regulatory taking. The plaintiff was in the process of developing a parcel of land when the Army Corps of Engineers issued a cease and desist order that prohibited further filing of wetlands absent the requisite permits. The plaintiff then submitted the necessary permit applications and entered into negotiations with the Corps in order to mitigate wetland damage. When the parties failed to reach a compromise, the plaintiff filed for declaratory relief, seeking an exemption from the Corps' wetlands jurisdiction. The U.S. District Court found the Corps' exercise of jurisdiction to be erroneous. Subsequent to this decision, Tabb Lakes filed a temporary takings claim seeking compensation for the period between the issuance of the cease and desist order and issuance of the District Court's decision. The District Court granting of the defendant's motion for summary judgment was affirmed on appeal to the Federal Circuit. Tabb Lakes, 10 F.3d at 801 (an assertion of regulatory jurisdiction by a government body cannot give rise to a takings claim.). The court stated that "mere fluctuations in value during the process of governmental decision making, absent extraordinary delay, are incident to ownership, they can not be considered a "taking in the constitutional sense." Tabb Lakes, 10 F.3d at 801 (citing Aginsv. City of Tiburon, 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106 (1980) (quotation marks omitted)). The court held that any mistake by the Corps in requiring a wetlands permit might give rise to a due process claim, but could not support a takings claim. Id. at 803.
With respect to the jurisdictional nature of the DEM's actions, this Court notes that under the terms of its February 10, 1994 decision, the DEM is obligated to abide by the wetlands elevations set out in its 1974 letter. This Court explicitly stated that no wetlands permits were required for projects constructed above the 247.5 foot contour elevation to the extent these projects have no effect upon wetlands located below this level. However, Woodland would still be required to submit final grading and drainage plans for review. This Court simply conditioned DEM's review of these plans upon the 1974 contour lines. This Court, in making these findings, did nothing more than delineate the bounds of DEM's authority. Accordingly, the February 10, 1994 decision constituted a clarification of the administrative framework within which the parties must operate.
It was the plaintiff's actions which ultimately precluded development of Woodland Manor III, for it was Woodland which failed to submit revised grading and drainage plans to the DEM for review. (See Defendant's Exhibit No. 12 — Transcript of the September 6, 1994 hearing). Moreover, the reason for the failure to submit these plans did not lie with DEM. The plaintiff's own witnesses offered testimony which established that other circumstances had changed which made the proposed development financially unfeasible. Because of changes in the IRS Tax Code and applicable HUD regulations, the Section 8 set-asides upon which the development relied, were no longer available and syndication to limited partners became impracticable. (See
Defendant's Exhibit No. 12 — Transcript of the September 6, 1994 hearing; Defendant's Exhibit No. 13 — Transcript of the January 1, 1995 deposition of John Montecalvo; and Plaintiff's Affidavit of Antonio Giordano).
The plaintiff fails to convince this Court that the defendant is not entitled to summary judgment. Plaintiff alleges that this Court's 1994 decision establishes that a taking occurred because development of Woodland Manor III was no longer possible. However, in the plaintiff's brief, this Court's prior statement that "the door to development via a permit application was no longer open" was taken out of context. In making this statement, the Court was referring only to the exhaustion of administrative remedies. This statement was not meant to be construed as a conclusive judicial finding that all future development was prohibited, thus giving rise to the presumption of an unconstitutional taking. This Court made that statement in the context of determining whether or not judicial review of the DEM's action was appropriate. It was this Court's determination, based upon the language contained in DEM's letter to the plaintiff, that any further action via the agency's administrative appeals process, as it concerned the specific wetlands application at issue, would prove futile. It was not meant to, and did not, imply that any and all permit applications, regardless of scope, would be mere gestures in futility. Moreover, the DEM never stated that all permit applications would be denied, only that it had determined that this application, if submitted, had the highest probability of denial. This Court deemed that statement sufficient to establish the existence of a constructive exhaustion of administrative remedies, not to imply that the DEM was prepared to disapprove any and all Woodland Manor wetlands permit applications, regardless of their scale and scope.
Plaintiff also directs this Court's attention to the Giordano Affidavit in an effort to rebut the defendant's assertions. However, this Court finds nothing therein which supports a denial of the defendant's motion for summary judgment. In a motion for summary judgment, this Court will examine the pleadings and affidavits in the light most favorable to the party opposing the motion. McPhillips, 582 A.2d at 749. However, the party opposing summary judgment may not rest upon mere allegation or denials in its pleadings and has an affirmative duty to set forth specific facts showing a genuine issue of fact to be resolved at trial.Ouimette, 541 A.2d at 856. The plaintiff has failed to satisfy that burden here. This Court finds no evidence whatsoever in the affidavit of Mr. Giordano that contradicts the jurisdictional claim advanced by the DEM. Standing alone, plaintiff's otherwise unsupported contradictory allegations do not suffice to rebut the defendant's motion for summary judgment.
After a careful consideration of the record in this case, this Court finds that there exists no genuine issue of material fact. Summary judgment is warranted because the initial permit requirements which form the basis of the plaintiff's takings claim amount to nothing more than a mere assertion of jurisdiction by the DEM. Such action is insufficient as a matter of law to constitute a taking, and the facts do not and cannot support a taking claim. Consequently, the defendant's motion for summary judgment with respect to the plaintiff's unconstitutional, temporary regulatory takings claim is granted.
Counsel shall submit the appropriate judgment for entry in accordance with this decision.
[1] Taken in part from Woodland Manor III Associates v. LouiseDurfee, C.A. 89-2447, February 10, 1994, Gibney, J.
[2] The entire "Planned Unit Development" will be referred to as Woodland Manor.
[3] The original 1974 DNR letter refers to a contour line of 147.5 feet. All references by the parties herein are to a 247.5 foot contour line. As a matter of record, this discrepancy is duly noted by this Court. However, this discrepancy has no bearing upon the substance of this Court's decision.
[4] The DNR's letter did conditionalize this permissive grant upon review and approval of final grading and drainage plans.
[5] See Lucas, 505 U.S. at 1029, 112 S.Ct. at 2900, 120 L.Ed.2d at 812; Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648.